Some years before the American Revolution, Robert Palmer, who was seized and possessed of the premises in question, removed to England, and settled in London, where he continued to reside to this time, leaving in this country his eldest son, William Palmer, who became a citizen of this State, and since the revolution died, in the lifetime of his father, leaving the plaintiff, Mary, his widow, and several children. By his will, duly executed, he devised the lands in (382) question to the said Mary, who afterwards intermarried with William Faris.
By an act of the Legislature, passed in their session of November, 1777, ch. 17, it is enacted, that "all the lands, etc., of which any person was seized or possessed, or to which any person had title on the 4th day of July, 1776, who on the said day was absent from this and every part of the United States, and who still is absent from the same, etc., and still resides beyond the limits of the United States, shall and are hereby *Page 319 
declared to be confiscated to the use of this State; unless such person shall, at the next General Assembly, which shall be held after the 1st day of October, in the year 1778, appear, and by the said Assembly be admitted to the privilege of a citizen of this State, and restored to the possession and property which to him once belonged within the same."
The first Assembly after the 1st day of October, 1778, was held in January, 1779, who passed an act to carry the Act of November, 1777, into effect. After setting forth in the preamble that "whereas many persons who come within the description of the aforesaid act, or some one of them, have failed or neglected to appear before the General Assembly during the present session, and submit to the State whether they shall be admitted citizens thereof, and restored to the possession which to them once belonged; whereby all such persons have clearly incurred and are become liable to the penalties of the aforesaid act"; the Assembly then goes on to enact, "That all the lands, etc., of every person and persons who come within, or are included within the description of the aforesaid act, or either of them, shall be and are hereby declared to be forfeited to the State, and shall be vested in the same, for the uses and purposes hereinafter mentioned, and for no other purpose whatsoever." Commissioners are appointed, and by the sixth section of the act they are directed, among other things, to let the lands, and by a proviso to that section it is provided, "nevertheless, that the child or children of such absentee or absentees, now in or under the protection of this State, shall be allowed so much of the estate of such absentee or absentees, as such wife, child, or children might have enjoyed (383) and have been allowed, as if such absentee had died intestate in this State, or any of the United States."
Robert Palmer was one of those who did not appear before the General Assembly and claim the privilege of becoming a citizen; Wm. Palmer was his eldest son, and would have been his heir-at-law and entitled to the inheritance of the premises, if his father had died in this State or any of the United States. The plaintiffs claim under the proviso above recited.
In October, 1779, the Assembly passed another act to carry into effect the act passed at New Bern in November, 1777. The preamble to this act declares that whereas, etc. (the same as in the Act of January the same year), and enacts, "that all the lands, etc., of Robert Palmer, and a number of others whose names are enumerated, which all or either of the persons aforesaid may have had on the 4th of July, 1776, or at any time since, shall be, and hereby declared to be confiscated, fully and absolutely forfeited to this State, and shall ve vested in the hands of commissioners for the purposes after mentioned." *Page 320 
By the 7th section of this act the commissioners are empowered to sell the lands, etc., and execute conveyances to the purchasers.
By the 16th section of the same act the Act of January, 1779, and every clause of it, is repealed and made void, any law to the contrary notwithstanding.
The defendant became a purchaser under this act, or the act passed in April, 1782, ch. 6, nearly to the same purpose as the above, and obtained a conveyance from the commissioners, duly executed, under which he claims.
It is first to be considered, by what authority the Assembly assumed a power to seize upon and appropriate to the public or any other use, the lands of individuals. For this information, it is necessary to have recourse to the fundamental principles of our government, as laid down in the bill of rights and Constitution, from which alone they derive all the powers and authorities which they have a right to exercise (384) over the persons and property of the citizens, either collectively or individually.
The bill of rights, section 25, after describing the boundaries of the State, declares "that the territories, seas, waters, and harbors, within the boundaries therein delineated, are the right and property of the people of this State, to be held in sovereignty," etc.
To this general declaration there are some reservations and exceptions. Of these it is only necessary to attend to the third proviso, as follows: "And provided further, that nothing herein contained shall affect the titles or possessions of individuals holding or claiming under the laws heretofore in force, or grants heretofore made under King George III, or his predecessors, or the late lords proprietors, or any of them."
By the declaratory part of this section, the people of this State assume to themselves, collectively, the right of property of all the lands within the boundaries of the State, not heretofore appropriated; and thereby disclaiming all right to interfere with the right of property heretofore vested in individuals, in the manner described in the proviso above. It is evident that by this proviso the titles of individual citizens of this State are secured to them, and placed out of the power of the collective body of the people; and consequently no act of their representatives in the General Assembly could divest or impair the titles which they held, under royal or proprietary grants, before the Revolution, or the existence of our present government; and any act which might be unadvisedly or arbitrarily made to that purpose would be a mere nullity, and would fall prostrate before the bill of rights, which is paramount to the acts of the Assembly, and exercises a controlling power over them, as often as they exceed the bounds prescribed to them by that instrument, which *Page 321 
should ever be held sacred and inviolable, as the best security of our civil rights, against the assumption of tyranny and despotism; such an act should not and ought not to have any weight to influence a decision in any court of judicature.
It is then to be considered how far this proviso or saving can have any influence or tendency to establish or secure the titles of (385) others than citizens from the assumption and appropriation of the Legislature.
The declaratory or enacting part of the clause regards the citizens or body of the people collectively within the boundaries therein described, and confers no territorial rights except to them; the saving in the proviso is to secure to the individuals of that collective body of the people their separate and individual titles to their lands, but cannot, as I apprehend, mean or intend to secure titles to lands or vest interests in individuals, not individuals of the collective body of the people of this State, but aliens and foreigners who had never become parties to the compact on which our government was formed, nor residing within the limits of its territory.
There were, however, at that time certain persons, our former fellow subjects, inhabitants of the State, who had not acceded to the revolution, and who never became parties to the social compact, who by the law of nations had, notwithstanding, a right to sell and dispose of their lands and remove their property. (See Vattell, Book 1, ch. 3, sec. 33.) The Act of April, 1777, ch. 3, delineates who are considered citizens of this State, or as they express it, "owe allegiance to the State,"; and in the same act declare it necessary that all persons who owe or acknowledge allegiance or obedience to the King of Great Britain, and refuse to take an oath of allegiance to this State, within a limited time, should be removed out of the State, allowing them to sell their lands, and remove their effects, and if not sold within a limited time, to be forfeited to the State. As the persons above described were inhabitants of the State at the time of the Declaration of American Independence, and at the time when the Constitution and bill of rights were adopted, they might perhaps be considered to come within the proviso, and the titles to their lands continued to be vested in them until they declared their election either to become members of the State, or to adhere to the royal government; which election they had a right to make, agreeably to the law of nations. (See the authority above referred to.) During that interval, they might sell or dispose of their lands; but as soon as (386) they had made their election in favor of the old government, and by that disclaimed any connection with the government established by the new Constitution, they were deprived of all the privileges which *Page 322 
accrued from it, unless under such indulgence as might be extended to them by the Legislature, in whom, as representatives of the people, the right of disposing of the public property, under such limitations and restrictions as they thought proper, were vested.
It is now to be considered whether William Palmer, under whom the plaintiffs claim, was at any time seized, or had any title in law to the premises.
At the time of the declaration of rights and adoption of the Constitution, Robert Palmer, being an alien, could not, as I conceive, acquire or hold any rights from them; he could not have acquired a title to any lands in this State for himself — all which he acquired by purchase or descent would be vested for the use of the State, who might at any time lay her hands upon them, if he had died after that period, even before any act for confiscating his property has passed — his heir-at-law, though a citizen of this State, could not have taken by descent, because his ancestor did not die seized; the premises having, agreeably to the principles above laid down, vested in the citizens of this State; and to entitle the heir, he must claim as heir to him who was last seized. Therefore, William Palmer, and they who claim under him, to entitle them to a recovery in this case, must derive a title from the State.
The only color of title shown by the plaintiffs is the 6th section of the 5th chapter of the Act of January, 1779; the words are, "shall be allowed," which seem to refer to some future act, to be executed by the State. Upon a claim being exhibited and admitted, there is no authority delegated by the act to any one to examine the claim, and carry into effect the intentions of the Legislature; the legal estate continued to be vested in the public, and could not be divested but by an actual conveyance or transfer, directly vesting it in some individual in words of the present tense; but words such as those used in the proviso, in (387) the future tense, cannot convey or vest the title of an estate; at most they amount only to a promise, and such a promise as in the case of a private person would not, perhaps, be binding in equity, as it was made without any valuable consideration. And yet, as it was made by so high and respectable an authority, and under such circumstances as it appears to me should have been held sacred and inviolable, and most conscientiously complied with and fulfilled.
The circumstances I allude to are these: that absentees who are at a great distance, perhaps aged and infirm, might probably rest contended that their property should be enjoyed by those who would be entitled to it after their death, which they might consider at no very distant period. The act, however, which passed in October, 1779, having revoked the promise of the State, if it can be considered as a promise, by repealing *Page 323 
the act of January, and declaring it null and void before any steps were taken substantially to carry their intention into effect, the claim of William Palmer was annihilated, and no longer existed either in law or equity, and the purchase under the last act stands good and valid.
Therefore, I am of opinion that judgment be entered for the defendant.
If it should be considered that the words in the proviso to the 25th section of the bill of rights, saving the titles or possessions of individuals, being general, extends to secure the titles of all persons, as well aliens as citizens, who claim under royal or proprietary grants, then Robert Palmer is included within the saving clause, and was not divested of his title, nor had the Assembly any right to appropriate his lands, which I do not admit; yet the plaintiff, in such case, cannot recover, having derived no title from him.